## Richmond

MORTON E. KALUS AND EMANUEL S. KALUS

V.

FOOD FAIR, INC., DART DRUG CORPORATION, VIRGINIA
AND DART DRUG CORPORATION

November 21, 1979.

Record No. 780083.

Present: Carrico, Harrison, Cochran, Harman, Poff and Compton, JJ.

*James C. Wilkes, Jr.,* for appellants.
*Charles F. Geschickter, Jr.* (*Brault, Lewis, Geschickter & Palmer,* on brief), for appellees.

HARRISON, J., delivered the opinion of the Court.

Food Fair, Inc., petitioned for a declaratory judgment and an injunction against Dart Drug Corporation, Virginia, Dart Drug Corporation, Morton E. Kalus, Emanuel S. Kalus, and Paul I. Burman. Food Fair was the tenant, and Dart Drug its subtenant under lease of commercial real property located in Arlington County, with the defendants, Kalus, Kalus, and Burman as landlords. It sought to have the court declare the rights and responsibilities of the parties respecting the repair and maintenance of the roof and sidewalks of the demised premises. From an adverse judgment by the lower court the landlords have noted this appeal.

In June 1960, Kalus agreed to construct a building and lease it to Food Fair for twenty years, with four five-year renewal options. Thereafter, on August 29, 1960, the parties entered into a written leasing agreement prepared by Food Fair. Although the lease is in great detail, we concern ourselves only with those paragraphs that provide the manner in which the leased building and premises are to be maintained and repaired.

Paragraph 16 of the lease, as finally executed, provides, in pertinent part, as follows:

16. Landlord shall, from time to time, at its own cost and expense, maintain and keep in good repair, the outside walls,

roof and all other outer portions of the Demised Premises [and the appurtenances to the Demised Premises including, but not limited to, the sidewalks, and the curbs adjacent to the Demised Premises, and all facilities servicing the Demised Premises, including utilities and appurtenances.]...Landlord also covenants and agrees that it will from time to time as may be necessary at its own cost and expense, make all structural repairs to Building, and repair any damage to any portion of the interior of Building resulting from Landlord's failure to repair and/or maintain the outer portions of Building,...If the Landlord shall fail, neglect or refuse to keep or place in repair said outside walls, roof or other outer portions, . . . Tenant shall have the right to make such repairs . . . and the cost thereof shall be payable by Landlord to Tenant on demand [with lawful interest thereon] and Tenant may deduct or retain the amount so paid out of any rents....[1]

In Paragraphs 17 and 18, the landlords covenant generally that they would provide heating plant and equipment, storage boxes, electrical, sprinkler, plumbing and sewerage systems, air conditioning systems and ducts, and other mechanical installations which would be in good working order, and that they would make any repairs or replacements for the first year of the lease.

Paragraph 21 provides that at the expiration of the term the tenant is under a duty to deliver the premises back to the landlords "in substantially as good a condition as they are at the beginning of the term hereof, damage by reasonable wear and tear excepted." Tenant's obligation to make any repairs is limited to the making of "ordinary repairs," with landlords responsible for making "structural repairs or repairs necessary to remedy damages caused by wear and tear, fire, war, civil riot and commotion, casualty, the elements, and acts beyond the control of the Tenant...."

Paragraph 22 gives the tenant the right to make alterations, additions and improvements, including installation of fixtures, facilities and equipment, but not the right to make any structural repairs unless the written consent of the landlords is previously obtained.

At the conclusion of Paragraphs 16, 17, and 18 is found the language "See rider attached paragraph 52." The rider provides as follows:

52. *RIDER TO PARAGRAPHS 16, 17, and 18.* Notwithstanding anything to the contrary contained herein, Tenant shall

---

[1] The bracketed language was stricken from the form lease before execution.

provide all nonstructural repairs to Demised Premises and to the mechanical systems enumerated in Paragraphs 16, 17 and 18 of this lease contained in Demised Premises. Tenant shall further make any structural repairs, the necessity for which arises from Tenant's negligence or the negligence of its agents, servants and employees. Landlord shall assign to Tenant all warranties or guarantees or other representations received by it from any parties who may have supplied Landlord with any of such systems installed in Demised Premises.

Kalus contends that this rider superseded Paragraph 21 of the lease which obligated the tenant to make only "ordinary repairs", with the landlords responsible for structural repairs or repairs necessary to remedy damages caused by wear and tear, and that it also superseded Paragraph 22 which allows the tenant to install fixtures unilaterally but requires the landlords' written consent for structural repairs.

The parties operated uneventfully under the lease for a period of approximately eight years. On December 20, 1968, Food Fair subleased the building to Dart Drug, with the concurrence of the landlords. Dart Drug was occupying the building in late 1973 when leaks in the roof were first detected. Food Fair requested Kalus, by letter dated November 15, 1973, to rectify the condition because, "[p]ursuant to the terms of our lease agreement the correction of this condition is the responsibility of the landlord. . . ." On January 2, 1974, an employee of Kalus wrote Food Fair that "[t]he roof leaks, other than the trash room, are our responsibility, and the order to repair same had been placed after our first conversation." On March 13, 1974, Food Fair again wrote Kalus, advising that "these leaks still exist" and it should have the landlords' immediate attention.

In July 1974, Dart commenced installation of new air conditioning equipment on the roof of the building. After the installation, Dart again complained that the roof was leaking. Kalus responded by inspecting the premises. Afterwards the landlords notified Food Fair that Dart Drug had been negligent in renovating the air conditioning system and that such negligence was responsible for the leaking roof. Kalus also complained that the front entrance of the building had been damaged by Dart's improper usage of that doorway as an unloading dock. Food Fair then gave Dart notice under the sublease of its default due to waste and demanded that Dart commence repairs within five days. It appears that Dart then made certain repairs to the roof but not in a manner satisfactory to Kalus for, in October 1975,

Food Fair again indicated to Dart that it would take "appropriate action."

During the summer of 1976, the roof leaks resumed, or continued, and Dart secured a contractor and had the roof repaired at a cost of $620. At the same time Dart had the sidewalk repaired at a cost of $159. On March 3, 1977, Dart withheld $779 of that month's rent payment due Food Fair to reimburse itself the amount it had paid incident to repairing the roof and sidewalk. Food Fair notified Klaus that it would withhold this amount from Food Fair's April 1977 rent payment to Kalus. On April 19, 1977, Kalus gave Food Fair formal notice of default under the lease and demanded payment of rent in full within ten days. Food Fair promptly filed its petition for a declaratory judgment to resolve the dispute between the landlords and Dart Drug and to obtain a construction of the lease agreement.

The court below, upon a trial without a jury, determined that the landlords, Morton E. Kalus and Emanuel S. Kalus,[2] have the legal responsibility under the August 29, 1960 lease agreement to maintain and keep in good repair the outside walls, roof, and all other outer portions of the demised premises, including the external fabric of the roof of the premises and the surrounding and adjoining sidewalks. The trial court further concluded that the landlords failed to establish that the repairs, necessitated by leaks in the fabric of the roof and the buckling of the sidewalk, were caused by any negligence on the part of Food Fair or Dart Drug. It therefore held that the tenant and subtenant were legally justified in withholding $779 from the rental payment due the landlords. The Kaluses have appealed and claim, *inter alia,* that the trial court erred in holding that repair and maintenance of the roof and sidewalk are the landlords' responsibility under their covenant to make "structural repairs," and in finding that the subtenant was free of negligence in causing the complained of roof leaks and sidewalk damage.

█ Our decision is controlled by the terms and provisions of the lease agreement. The intent of the parties is paramount in construing the terms of the lease. In determining their intent we look to the instrument as a whole. We find the agreement clear and unambiguous.

█ The simple issue is who is responsible for repairing the roof and the sidewalk in the absence of negligence on the part of the tenant? The roof in question is described as an asphalt, built-up roof, consisting of layers of tar paper on which hot tar is applied with gravel placed on top. The landlords maintain that there is nothing structural about this type of roof, nor about its top fabric which allegedly was repaired

[2] At the time of trial Burman was no longer a partner of the Kaluses and had no interest in the property involved or the litigation.

by Dart to stop the leak therein. They point to the structural and architectural plans, which they say were inspired by Food Fair, to show that the structural components included the steel structure, bridging for the roof, building columns, and foundation. The roof frame structural plans indicated no roofing material or sidewalk detail. They claim the architectural plans indicated the composition of the roof surfacing material. The landlords' expert witness, a licensed structural engineer, testified that a built-up roof and a sidewalk are not structural and are not the concern of structural engineers.

The trial judge concluded that in the preparation and execution of the lease agreement the parties did not use the term "structural" in its technical sense but as the term would be used and construed by lawyers and businessmen and businesswomen dealing with commercial leases. Specifically, we determine here how the word "structural" was used and construed by the landlords and tenant, and whether they regarded repairs to the roof as structural or non-structural repair. To do this we refer again to the agreement.

Paragraph 16 of the lease provides clearly that the landlords shall maintain and keep in good repair the outside walls, roof, and all other outer portions of the demised premises; and upon their failure to do so the tenant shall have the right to make the repairs and to recover the cost from the landlords. Paragraph 21 stipulates that the tenant's obligation to make ordinary repairs shall not include any obligation to make structural repairs or repairs necessary to remedy damage caused by wear and tear, the elements and acts beyond the control of the tenant.

We do not agree that Rider 52 superseded the detailed and extensive agreements found in Paragraphs 16, 17, 21, and 22 of the lease or that the rider had the effect of relieving the landlords of the duty to keep the roof and other outer portions of the demised premises in good repair. The words "structural" and "nonstructural" have the same meaning in the rider as they do in the paragraphs to which the rider is attached. The rider stresses the fact that the tenant provides nonstructural repairs to the premises and to the mechanical systems and is under obligation to make structural repairs *only* in event the necessity arises from the tenant's negligence. The roof of any building is a vital and substantial portion of the structure, if not the most vital and substantial portion, and it is indispensable to the use of the building. It is commonly regarded as a structural component of a building, and any repairs made to the roof are regarded as structural repairs. But of more importance here, the parties specifically contracted that the landlords would "keep in good repair the outside walls, roof and all other outer portions of the Demised Premises." Had they

intended to revoke or modify this provision we are convinced they would have selected a vehicle other than Rider 52 or would have employed different language to accomplish their purpose.

We find no error in the action of the trial judge in holding that under the lease agreement the landlords have the legal responsibility "to maintain and keep in good repair the outside walls, roof, and all other outer portions of the demised premises, which are not decorative in nature, including the external fabric of the roof of the premises. . . ."

■ There is evidence that Dart Drug was negligent in the manner in which it installed the air conditioning equipment and that it failed to repair promptly the roof which had been damaged by workmen. However, this damage was later repaired by Dart. It was the leak which developed thereafter in July 1976, also repaired by Dart, that resulted in its withholding the sum of $779 from its March 1977 monthly rental payment. While Morton E. Kalus testified that someone had apparently thrown some coping tiles on or around the roof, which could possibly have caused the leak, the evidence was not sufficient to show that this act was done by the tenant or any of its agents. Under the terms of the lease, the landlords could have avoided the responsibility of repairing the roof only by showing that the repairs were necessitated by the tenant's negligence. The burden of showing such negligence by a preponderance of the evidence was properly placed on the landlords. The trial judge found that the landlords failed to carry this burden, and we agree.

■ However, we do not agree that under the terms of the lease the landlords had the responsibility of maintaining and repairing the sidewalk. As we have heretofore noted the parties deleted from Paragraph 16 of the lease the language "and the appurtenances to the Demised Premises *including*, but not limited to, *the sidewalks, and the curbs* adjacent to the Demised Premises, and all facilities servicing the Demised Premises, including utilities and appurtenances." (Emphasis added.) This action by the landlords and the tenant clearly manifested their intent to relieve the landlords of the responsibility of maintaining and keeping in repair the sidewalks and the curbs adjacent to the leased premises. The damage to the sidewalk was in front of the building, at its entranceway, and was caused by freezing weather. We do not regard the sidewalk involved here as a structural component of or an outer portion of the building leased to Food Fair. Accordingly, we decide that the court below erred in so finding and in decreeing that the entire $779, including the $159 representing repairs to the sidewalk, placed in escrow by Food Fair, be released to the tenant. In all other respects the final order of the court below will be affirmed.

*Affirmed in part, reversed in part, and remanded.*